WEBER (UNITED STATES v.). See Case No. 16,657.

## Case No. 17,330.

### In re WEBER FURNITURE CO.

[13 N. B. R. 529.] [1]

District Court, E. D. Michigan. 1876.

#### BANKRUPTCY OF CORPORATIONS—COMPOSITION PROCEEDINGS.

1. Corporations as well as natural persons have the right to avail themselves of the provisions of the bankrupt law [of 1867 (14 Stat. 517)] pertaining to composition.

2. In deciding a motion to confirm a resolution of compromise, the court will take into account the relations of the creditors favoring the compromise to the debtor, and the relative number of creditors whose individual opinions are expressed in person by the resolution as compared with those who dissent.

[Cited in Re Keller. Case No. 7,654.]
[Cited in brief in Scott v. Olmstead, 52 Vt. 212.]

3. A resolution of compromise which is palpably opposed to the best interests of all concerned will not be confirmed.

On May 17th, 1875, thirteen creditors of the company filed their petition, setting forth certain acts of bankruptcy, and praying that the company might be adjudged a bankrupt. An order to show cause was issued, returnable on the 17th of May, when a denial of bankruptcy and a demand for a trial by jury were interposed. No further proceedings were had on this petition; but on the 25th of June, the company petitioned that an order might be made for a meeting of the creditors to consid-

1 [Reprinted by permission.]

er a proposal for a composition, under section 43, as amended by section 17 of the act of June 22, 1874 [18 Stat. 178]. In compliance with this petition, a meeting of the creditors was ordered, at which it was resolved by a very large majority of the creditors, far exceeding in number and amount the requirements of the act, that it was for the best interests of all concerned to accept twenty cents on the dollar in full satisfaction and discharge of the debts of the company, provided that Bernard Stroh should, by joining in the composition, insure and promise the payment of the sum in cash within fifteen days after the resolution should be recorded. George Moebs, to whom the company, prior to the proceedings in bankruptcy, had made an assignment of its entire property for the benefit of the creditors, also joined in this composition, and released all his right, title, and interest in the assets of the company, which were to be transferred to Stroh on payment of such twenty per cent. Henry Weber, manager of the company, and personally bound as indorser upon a large amount of its paper, expressly covenanted that the compromise should not release or affect his liability as such indorser.

On the 23d of July, eleven days after the meeting was held, the Detroit Chair Company, a creditor of the Weber Company, filed with the register the following objections to the composition: First. That the Weber Furniture Company is a business corporation, and under the bankrupt act cannot be discharged of its debts, and is not entitled to the privileges of the proceedings contemplated by section 43. Second. That said company, prior to the filing of the petition for adjudication as a bankrupt, made and delivered an assignment of all its property to George Moebs, as assignee, who accepted the same, for the benefit of all its creditors, share and share alike, and by which all the creditors became rightfully entitled to have such assignment carried out; and such right cannot be defeated by any such proceedings, as is attempted under said section 43. Third. That the proposition to pay twenty per cent., when the statement of the assets showed that fifty per cent. will and can be paid, is unjust, and ought not to be considered or accepted.

Certain other objections were filed, but were not urged upon the argument. In all, ten creditors, representing about fifteen thousand five hundred dollars, joined in these and similar objections.

Don M. Dickinson, Alfred Russell, and Ashley Pond, for the motion.

J. W. McGrath, F. H. Canfield, D. C. Holbrook, and C. I. Walker, for the objecting creditors.

BROWN, District Judge. The first objection, that proceedings for a composition cannot be taken by a corporation, is based upon the last clause of section 5122 of the Revised Statutes, which provides, that "no allowance or discharge shall be granted to any corpora-

tion or joint stock company, or to any person, or officer, or member thereof." It is claimed that as the composition, when ratified by a sufficient number of votes, operates as a satisfaction of all debts exhibited in the statement of the debtor, it in effect amounts to a discharge, and hence falls within the inhibition contained in section 5122, above cited. All the other provisions of the act apparently apply as well to corporations as to natural persons. Indeed, section 5013 declares, that the word "person" shall also include corporations; and the general rule undoubtedly is, that where persons are mentioned in a statute, corporations are included, if they fall within the general design of the act. Ang. & A. Corp. §§ 6, 191; Commissioners v. Bank of Brest, Har. (Mich.) 106; Town v. Bank of River Raisin, 2 Doug. (Mich.) 530. The original act provided only for a discharge by order of the court. It is true that section 43 provided for the superseding of proceedings in bankruptcy by the choice of a trustee, to whom the assignee might transfer the entire property of the bankrupt; but no provision was there made for a composition or satisfaction of debts. Indeed, the section expressly provides that a bankrupt should have a like right to apply for and obtain a discharge after the passing of such resolution, and the appointing of such trustees, as if the resolution had not been passed. By the 17th section, however, of the act of June 22, 1874, amending section 43, an entirely new proceeding is contemplated. The debtor may propose to his creditors a compromise, and such compromise, when obtained, shall be accepted in satisfaction of debts due them from the debtor. Corporations are not expressly excluded from the benefits of this provision. I cannot see that they are excluded by implication. The word "discharge" used in section 5122 evidently applies to a discharge by order of the court upon a petition of the debtor. This is the only discharge contemplated in the original act. Seven years thereafter a new provision is engrafted upon the act, by which the debtor may obtain a satisfaction of his debts by the act of his creditors. I see no reason why this should not apply equally as well to corporations as to natural persons. No express adjudication is found upon this point, although it was found in the Case of Haskell [Case No. 6,192], that it was not the intention of the statute that no debtor could make a composition with his creditors, who, by reason of preference, or otherwise would not be able to obtain his discharge. This case falls within the general rule in question: that the inability of the debtor to obtain a discharge by order of the court does not preclude his obtaining satisfaction of his debts by way of composition.

The third objection is substantially, that the composition is not "for the best interests of all concerned," within the meaning of the statute. From the language of section 17, of the amended act, I think that to justify the court in confirming the composition, the following

facts should be made affirmatively to appear: (1) That a meeting had been called under the direction of the court, and upon not less than ten days' notice to each creditor, of the time, place, and purpose of such meeting. (2) That a resolution has been passed by a majority in number and three fourths in value of the creditors of the debtor, assembled at such meeting, either in person or by proxy. (3) That it has been confirmed by the signatures thereto by the debtor, and two-thirds in number and one-half in value of all the creditors. (4) That notice of the presentation of the resolution has been given to all the creditors of the debtor of not less than five days. (5) That the composition is for the best interests of all concerned. Upon the establishment of these facts, it is the duty of the court to cause such resolution to be recorded, and a statement of the assets and the debts, which the debtor is required to produce at the meeting of the creditors, to be filed.

Upon the argument of this motion much discussion was had upon the question, how far the court was authorized to examine into the reasonableness of the proposed compromise. Under the former English bankrupt act there seems to be some difference of opinion as to the duty of the court in this regard. In the case of Latham v. Lafone, L. R. 2 Exch. 115, Mr. Chief Baron Kelly, in commenting upon composition deeds under the bankrupt act, uses the following language: "Looking at the general scope of the enactment, I am of opinion that the intention of the legislature was to leave to the majority of the creditors the decision of all questions of expediency as to the affairs of the insolvent debtor, but to reserve to the courts of law the determination of the reasonableness of their arrangements. The act has, for the first time, conferred upon a specific majority of the creditors the power to bind the rest by their informally given vote, but the protection of the interests of the remainder is committed to the law, and before we can hold the deed binding upon nonassenting creditors, we must see that it is not unreasonable in the mode in which it affects them." The majority of the court, however, seem to have decided the case upon the ground that the deed in question was not within the purview of the act, and had some doubt as to the opinion of the chief baron upon the question of reasonableness. There is no doubt, however, that where the composition is so unreasonable as to be evidence that the creditors who signed it were actuated by friendly feeling toward the debtor to accept a composition greatly disproportioned to the assets, or where it was apparent that they did not act bona fide for the benefit of all the creditors of the debtor, it will not be upheld. See Ex parte Cowen, 2 Ch. App. 563. It must be conceded in both these cases that courts of law in dealing with deeds of this description have held that the deeds must be reasonable. See, also, the following cases: Dingwall v. Edwards, 4 Best & S. 728; Wells v. Hacon, 5 Best & S. 196; In re Rich-mond Hill Hotel Co., L. R. 4 Eq. 566; Ex parte Nicholson, 5 Ch. App. 332; In re Richmond Hill Hotel Co., 3 Ch. App. 10; Ex parte Roots, 2 Ch. App. 559; Ex parte Radcliffe Investment Co., L. R. 17 Eq. 121; Ex parte Duignan, L. R. 11 Eq. 604; Ex parte Birmingham Gaslight & Coke Co., L. R. 11 Eq. 204; Ex parte Levy & Co., Id. 619; Bell v. Bird, L. R. 6 Eq. 635. The recent English bankrupt act of 1869 has apparently been construed as taking away from the courts every question, except that of fraud or bad faith in obtaining the compromise. See Ex parte Linsley, 9 Ch. App. 290; Bissell v. Jones, L. R. 4 Q. B. 49. I have not the full text of the English bankrupt law before me, but the only power given to the courts seems to be found in the section quoted in Ex parte Radcliffe Investment Co., L. R. 17 Eq. 124, note, which follows nearly the language of the last clause of section 17 of the act of 1874, and enacts that if it appears to the court, on satisfactory evidence, that a composition under the section cannot, in consequence of legal difficulties, or for any sufficient cause, proceed without injustice or undue delay to the creditors or to the debtor, the court m·· adjudge the debtor a bankrupt, and proceedings be had accordingly. It does not seem to be necessary that the court should find the compromise to be for the best interests of all concerned, as required by our act. Hence the English decisions upon the questions of reasonableness do not seem to be applicable here. I find but one American case upon this point. In Re Whipple [Case No. 17,513], in which it was held by Judge Lowell, that congress had imposed upon the courts the difficult and delicate responsibility of rejecting a composition, if opposed by a small minority of the creditors, when it is made to appear that a·settlement in bankruptcy would be more for their interest. He announced the rule that the judge must make his comparison, not with what the debtor might possibly have done, but rather with what the assignee in bankruptcy could do. I am entirely content with this view of the law, and, indeed, I hardly see how any other construction can be placed upon the words: "Being satisfied that the same is for the best interests of all concerned." It is not unfrequently the case that a small division in cash is hastily accepted by the creditor without a careful examination of the debtor's condition, especially if his claims be small and the expenses of opposing a composition would be greater than any additional dividend he might receive. Not unfrequently, too, he is actuated by friendly feelings toward the debtor, or by fear that the estate would suffer a material diminution in the bankruptcy court, or by the pressing needs of the creditor himself, to whom a small percentage in cash may be of more value than a much larger dividend paid after the lapse of months; but where a composition deed has been signed by a large majority of the creditors upon a full consideration of the condition of the debtor, I should be very reluctant to over-

rule their judgment simply because I thought the estate would yield a larger dividend in bankruptcy. Much would depend upon the character of the property and the state of the markets. In the case above cited, Judge Lowell intimated "that a difference of five per cent. upon the amount of the debts, and the probable amount of the assets, would not be sufficient to induce me to reject the resolution." I would go even further than that, and say that, where the property consisted of real estate or of goods, the value of which depended upon the caprices of fashion, or other like contingencies, I would not overrule the discretion of the creditors, fairly exercised, if the difference were ten, or even fifteen per cent.

In the case at bar there were seventy-four creditors present at the meeting, in person or by attorney, representing debts to the amount of one hundred and four thousand two hundred and sixty-four dollars and fifty-two cents. The debtor produced at the meeting a statement showing the whole of his debts and assets, and the names and addresses of his creditors to whom said debts respectively were due, and the resolution in question was adopted by a vote of seventy-two creditors, representing one hundred and three thousand four hundred and seventy-six dollars and ninety-six cents, against two, representing seven hundred and eighty-seven dollars and fifty-six cents. It does not appear how many of these creditors were present in person, and how many by attorney; nor is it material to the consideration of this case. The statement furnished by the debtor at the meeting showed a list of one hundred and sixty-three creditors, representing two hundred and fourteen thousand four hundred and seventy-five dollars and thirty-two cents. Of these, one hundred and sixty-one creditors, representing one hundred and forty-six thousand nine hundred and seventy-nine dollars and seventy-five cents, signed the composition. Of the one hundred and sixty-three creditors, one hundred and thirteen, whose debts exceeded fifty dollars in amount, proved claims in the aggregate sum of one hundred and sixty-seven thousand three hundred and thirty-seven dollars and ten cents; forty-seven creditors, representing an aggregate of sixty-seven thousand four hundred and ninety-five dollars and fifty-seven cents, have either neglected or refused to join in this action; but fourteen of these appear to have proved their debts. Under ordinary circumstances, had this larger vote in favor of the compromise expressed the personal opinion of each of these one hundred and sixteen creditors, I should have felt constrained to confirm their action, although I might have thought they had erred, and erred widely, in coming to this conclusion. But in determining the reasonableness of a compromise like this, I think it legitimate to inquire how many individual opinions were expressed in favor of it. If, on examination, it were found that a few persons represented a very large number of creditors and a very large amount of claims. I should feel much less

reluctant in reviewing their decision, though each vote represented an individual opinion. On examination of this case, it appears that, although one hundred and sixteen creditors have signed this composition, eighty-eight of them were represented by four attorneys, so that there were in fact but thirty-two individuals whose presumed opinion was expressed in favor of this compromise. As there were forty-seven non-assenting creditors, supposing each to have expressed his opinion in the case, there is actually a large majority who have pronounced against it.

Again, in the case of Ex parte Cowen, above cited, it was held a proper subject of comment, that certain of the creditors were actuated by feelings of charity and benevolence toward the debtor, and certain others were related to him by marriage. Indeed, I think the court may take into consideration any fact tending to show that the creditor was influenced by friendly feelings, or by any other motives than those which usually actuate creditors in endeavoring to make the best terms with a debtor or to whose personal responsibility they have trusted. I find in this case, that Mr. Dickinson, attorney for twenty-seven creditors, acted as solicitor for the debtor, and filed a denial of bankruptcy and a demand for a trial by jury. He appears also, by one of the depositions on file, to have been retained to defend several suits brought up against the company in the common law courts. While it is entirely probable that his retainer by the company in these matters may have familarized him with its affairs, and enabled him to form a juster estimate of the amount it was able to pay by way of compromise, it is also possible it may have somewhat prejudiced him in forming his judgment as to the propriety of such compromise. Occupying these apparently antagonistic positions, it cannot be expected that the court will give the weight to his judgment, to which, under other circumstances, it would be justly entitled. Mr. George F. Marks, attorney for twenty creditors, appears, by his deposition in proof of a personal debt, to have been general foreman for the furniture company for ten months prior to the destruction of its manufactory by fire. While imputing no bad faith to him, his position was not that of an ordinary creditor seeking to make the most out of his debtor's assets, and his vote should not be entitled to great weight as to the non-assenting creditors. Of the twenty-eight creditors not represented by either of these four attorneys, twenty-two signed the composition in person. Of these twenty-two, however, but four held claims exceeding three 'hundred and fifty dollars in amount. One of these was the firm of George Moebs & Co., representing a debt of twenty thousand and one dollars and fifty-six cents. Not only is the head of this firm, George Moebs, the common law assignee of the furniture company, but the note representing the debt of his firm is secured by indorsement of Mr. Stroh, the person to whom it is proposed, by this

composition, to turn over the entire assets of the company. Mr. Dickinson, who represents a claim of seven hundred dollars, is, as has already been observed, the solicitor for the debtor in this case. Philip H. Marks, who has proved a claim of nine thousand three hundred and five dollars, is also secured to the amount of eight thousand dollars by the indorsement of Mr. Stroh. The fourth creditor who signed in person, is the firm of Holmes & Co., representing seven thousand three hundred and sixty-five dollars and thirty-six cents. This claim is apparently subject to no comment. The remaining eighteen creditors represent but two thousand three hundred and ninety-eight dollars and thirty-eight cents, an average of one hundred and thirty-two dollars and ninety-six cents; a very small amount compared with the aggregate of the assenting creditors, and particularly small as compared with the amounts represented by the four attorneys already referred to. Mr. Russell, attorney for thirty-five creditors, represents fifty thousand nine hundred and six dollars and eighty-five cents, an average of one thousand seven hundred and forty dollars and nineteen cents. Mr. Dickinson, the attorney for the twenty-seven creditors, represents twenty-two thousand eight hundred and ninety-five dollars and ninety-four cents, an average of eight hundred and forty-seven dollars and ninety cents. Mr. Somers, attorney for six creditors, represents five thousand nine hundred and ninety-seven dollars and fifty-two cents, an average of nine hundred and ninety-nine dollars and fifty-eight cents. Mr. Marks, the fourth attorney, represents twenty creditors, an average of but one hundred and seventeen dollars and thirty-eight cents. His claims, however, appear to be those of the employees of the company. These four attorneys, therefore, represent eighty-two thousand one hundred and forty-eight dollars and two cents out of one hundred and forty-six thousand eight hundred and seventy-nine dollars and seventy-eight cents. Some stress was also laid upon the fact that the Detroit Savings Bank, a wealthy local corporation, a creditor to the amount of fourteen thousand two hundred and seventy-five dollars and thirty-five cents, had assented to this compromise. I find, however, on examination of its proof of debt, that it is represented by notes secured by the personal obligation of Henry Weber, and by collaterals deposited by Weber to secure the performance of this obligation, and that out of these collaterals, before the proof of debt in question, there had already been realized about ten thousand dollars.

I have alluded to these facts, not to show that there is any irregularity or invalidity in the adoption of this compromise, but simply to prove that there is not that preponderance of unbiased individual judgment, which, at first blush, the figures would seem to indicate.

I proceed now to inquire how this discretion has been exercised. At a meeting of the creditors called to consider the propriety of adopting a compromise, the debtor submitted a statement of its assets, substantially as follows:

| | | |
|---|---:|---:|
| Merchandise | $44,179 | 07 |
| Accounts and notes, good | 14,197 | 43 |
| Accounts and notes, doubtful | 19,297 | 27 |
| Accounts and notes, claiming offsets | 4,123 | 20 |
| Accounts and notes collected by H. Weber that should be charged to him | 6,803 | 25 |
| Accounts and notes, worthless | 893 | 67 |
| Entered as profit and loss in 1874 | 46,653 | 04 |
| Real estate, consisting of vacant lots and wild lands in different parts of the state | 9,922 | 34 |
| Insurance on the manufactory of the corporation and its contents, which, just prior to the assignment, had been destroyed by fire | 68,500 | 00 |
| Horses | 310 | 00 |
| Tools | 387 | 02 |
| Cash | 183 | 93 |

The amount of debts stated in its schedule, filed at the same time, is about two hundred and fifteen thousand dollars, as above stated. Now, assuming that the figures above given represent the actual value of the property, it will be seen that the merchandise alone will pay the twenty per cent. offered by way of compromise; that the insurance alone would pay a dividend of about thirty-two per cent. The probable dividend which an assignee in bankruptcy would realize is shown by the following estimate to be nearly forty-eight per cent. If the estimate placed by the debtor upon its assets be correct, the estate ought to realize for its creditors from forty to forty-five per cent.:

### Assets.

| | | |
|---|---:|---:|
| Merchandise as per inventory | $ 44,179 | 07 |
| Assets and notes, good | 14,197 | 43 |
| Assets and notes, doubtful; at fifty per cent | 9,648 | 63 |
| Assets and notes collected by Weber | 6,803 | 25 |
| Real estate | 9,922 | 34 |
| Insurance | 68,500 | 00 |
| Horses | 310 | 00 |
| Tools | 387 | 02 |
| Cash | 183 | 93 |
| | $154,131 | 67 |

### Deductions.

| | | | |
|---|---:|---:|---:|
| Assets carried forward | | $154,131 | 67 |
| Profit and loss account | $46,653 84 | | |
| Paid workmen since petition filed | 4,275 39 | | |
| Premiums on insurance | 661 50 | | |
| | | 51,590 | 73 |
| Net assets | | $102,590 | 94 |

But it is claimed that the court cannot assume that the amounts set opposite these respective items represent the actual value of the assets in question, but simply their face value; but the term "face value" is evidently inapplicable to any items except the accounts and notes and the insurance. With reference to the accounts and notes, the debtor has expressly excluded this construction by classifying them as "good," "doubtful," "claiming offsets," and "worthless." I can put no other construction upon the word "good," except that in the opinion of the debtor such accounts and notes are good for their face. In making my calculations, I have estimated the doubtful

WEBER (Case No. 17,331)

as worth fifty per cent on their face value, perhaps as reasonable a construction as could be given to this word. I have left out of consideration entirely those pronounced worthless, as well as those to which offsets are claimed. The merchandise is valued as per inventory, and it was suggested that it is usual to inventory at cost, and that the court could not presume that the furniture would realize at a forced sale as much as this; but it must be borne in mind that the company was itself a manufacturer of furniture; that its business was to manufacture at a profit, and, if there is any presumption about it, it would be that it would realize more than the actual cost of manufacture.

I can put no other construction upon the figures set opposite the items of real estate, except that this is the value of the real estate in the estimation of the debtor. I think I must assume that the item of sixty-three thousand five hundred dollars insurance, represents the face of the policies held by the company upon its manufactory. It was hinted that the companies claim a defense to these policies upon the ground that Mr. Weber had himself set fire to the manufactory in question. Nothing of this kind appears in the record. It does not even appear that the companies have refused to pay, or that payment has been demanded. Even if suits had been commenced, and a defense pleaded by the companies, I do not see that the court could assume that these defenses were good, and that the policies were absolutely worthless, when the suits may possibly have been collusive, and the defenses interposed for the very purpose of leading the creditors to believe the insurance could not be collected. In the affidavit annexed to this statement Mr. Weber swears the statement of assets is a true statement of such assets, and that the different items thereof were truly characterized in such statement. If the figures set opposite these respective items represent anything at all, they represent the value placed by the debtor upon the items in question, and it is highly improbable that in seeking a compromise with its creditors it would over estimate the value of assets from which these creditors were to realize their claims. While I have no doubt that it is sufficient prima facie evidence that the composition is for the best interest of all concerned, to show that the requisite majority of creditors have accepted and that the burden of proof is then thrown upon the dissenting creditors, still, where the record shows upon its face, by the debtor's own statement, that his estate is able to pay a much larger dividend, I think the dissenting creditors may rely upon this statement, and are not bound to prove the facts by affidavits, which would only corroborate it. If the debtor's statement under estimates the value of his property, the creditors may prove the fact by affidavits, or, perhaps, may take a reference to the register; but they are not compelled to do so, if they are content, as in this case, to accept the debtor's

statement as true. How this compromise was able to obtain the large vote it did, I am unable to understand. Certainly it could not have been by the statements apparent upon this record, or by the arguments made upon the hearing of this motion. Upon the face of this record, as it is laid before me, I have no hesitation in pronouncing against this composition. My conclusion upon this point renders it unnecessary to consider the very difficult questions arising under the second objection. An order will be entered denying the motion to confirm and record the composition.

[This order was reversed, on review, by the circuit court. See Case No. 17,331.]